UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NHU WEINBERG, et al.,<br><br>    Plaintiffs,<br><br>v.<br><br>TWITTER, INC., et al.,<br><br>    Defendants. | Case No. 23-cv-04016-AMO<br><br>**ORDER RE MOTION TO DISMISS AND MOTION TO STRIKE**<br><br>Re: Dkt. No. 23 |

This is a putative class action involving claims of employment discrimination. Before the Court is Defendants Twitter, Inc.'s and X Corp.'s motion to dismiss the Complaint. The matter is fully briefed and suitable for decision without oral argument. Accordingly, the hearing set for June 6, 2024, was VACATED. *See* Civ. L.R. 7-1(b). Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the Court **GRANTS** in part and **DENIES** in part the motion to dismiss, for the following reasons.

## I.   BACKGROUND

### A.   Factual Background[1]

Plaintiffs Nhu Weinberg, Samantha Gongora, Julia Steele, Omolade Ogunsanya, Nanci Sills, Krista Bessinger, and Ikuhiro Ihara ("Plaintiffs") are former employees of Defendant X Corp., successor in interest to Twitter, Inc. ("Twitter").[2]

---

[1] The Court accepts Plaintiffs' allegations in the SAC as true and construes the pleadings in the light most favorable to Plaintiffs. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted).

[2] Twitter and X merged "[i]n or about March 2023" and are therefore "a single entity." Compl. ¶ 18. This order hereafter refers to Defendants collectively as "Twitter."

Elon Musk completed his purchase of Twitter in late October 2022 and immediately began a reduction-in-force ("RIF"), laying off more than half of its workforce, including Plaintiffs. Compl. ¶¶ 1, 6-7, 21-23. The decisions regarding which employees would be laid off were made under hurried circumstances in just a few days by a small group of managers under Musk's supervision. Compl. ¶¶ 24-26. Some of these managers were brought in from other companies owned by Musk and had little knowledge about Twitter's operations. Compl. ¶ 24. In selecting employees for layoff, little attention was given to employees' job performance, qualifications, experience, and abilities. Compl. ¶ 24. Twitter notified most of the laid off employees on November 4, 2022, and it notified others, including Ihara, on November 23, 2022. Compl. ¶ 25.

### 1. Improper Interference with FMLA Rights

Weinberg took 10 weeks of leave under the Family and Medical Leave Act ("FMLA") to care for her child and returned from her leave less than a month before she was informed of her layoff on November 4, 2022. Compl. ¶¶ 28-29. Approximately 60% of employees who were on leave at the time of the RIF were notified that they were being laid off, compared to approximately 51% of employees overall. Compl. ¶ 30. Further, most of the employees who were on leave but not terminated during the RIF were no longer employed by the company following Musk's subsequent ultimatum that employees agree to being "extremely hardcore" and "working long hours at high intensity" to remain employed at Twitter. Compl. ¶ 30. Weinberg brings an FMLA claim on behalf of herself and on behalf of all employees who were laid off by Twitter following Musk's acquisition of the company and who had recently taken, or were preparing to take, family or medical leave under the FMLA. Compl. ¶ 8.

### 2. Allegations Relating to Sex Discrimination Under Title VII

Weinberg, Gongora, Steele, Sills, and Bessinger advance that Twitter's mass layoff affected women significantly more than men. Compl. ¶¶ 27, 43. Amid the layoff, the media reported on widely circulated pictures of Twitter employees which revealed a stark contrast in the number of women who appeared to be employed at the company before and after Musk's acquisition. Compl. ¶ 31. Spreadsheets showing which Twitter employees in the United States were retained and which were laid off on November 4, 2022, reveal that Twitter laid off

2

approximately 57% of its female employees, compared to 47% of its male employees. Compl. ¶¶ 32-36. Plaintiffs cite to statistical analysis demonstrating extremely slim odds that such disparity was based on chance alone. Compl. ¶ 37 (referring to the analysis of Dr. Mark Killingsworth, a professor in the Department of Economics at Rutgers University). Data from Twitter's spreadsheet showed that the sex-based disparity was more pronounced when only engineering roles were considered. Compl. ¶¶ 39, 40. Similarly, there also exists a significant disparity in the layoff rates between women and men in non-engineering roles. Compl. ¶ 41.

Elon Musk has made sexist, demeaning, and hostile comments about and directed towards women that should be imputed to Twitter. Compl. ¶ 44. For example, Musk publicly joked about naming a school using the acronym "TITS"; he also joked about women's breasts on Twitter, tweeted "Testosterone rocks ngl," and made clear his belief that it was more important for women to have a lot of babies than to pursue their careers. Compl. ¶¶ 45-46. Musk also had the "w" on the sign of the corporate headquarters painted white so that the company's name appeared to be "Titter." Compl. ¶ 47.

### 3. Allegations Relating to Race Discrimination Under Title VII

Ogunsanya advances that Twitter's mass layoff affected Black employees significantly more than white employees. Compl. ¶¶ 27, 48. Further, Twitter's racially discriminatory conduct is substantiated by Musk's documented history of support for racist groups and hate speech directed at Black people. Compl. ¶ 49-50. Musk defended Scott Adams, for example, the creator of the comic strip "Dilbert," after Adams called Black Americans a "hate group" and suggested that white people should "get the hell away" from them. Compl. ¶ 50. Musk's public statements should be imputed to his company. Compl. ¶ 49.

### 4. Allegations Relating to Age Discrimination Under the ADEA

Bessinger and Ihara advance that Twitter's mass layoff affected employees aged fifty (50) and older significantly more than younger employees. Compl. ¶¶ 27, 52. Based on data Twitter provided employees pursuant to the Older Workers Benefit Protection Act ("OWBPA"), 149 (or 60%) of the 248 employees ages fifty (50) or over employed by Twitter were laid off on

November 4, 2022. Compl. ¶¶ 53-55. By comparison, the data indicates only 54% of employees under the age of fifty (50) were laid off. Compl. ¶ 55.

Musk has a history of making ageist comments that should be imputed to the company he took over. Compl. ¶ 58. These comments include his statement in an interview that "I don't think we should try to have people live for a really long time" because "if they don't die, we will be stuck with old ideas and society wouldn't advance . . . [a]nd it is just impossible to stay in touch with the people if you are many generations older than them." Compl. ¶ 59.

## II.  DISCUSSION

Twitter moves to dismiss the Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). After setting forth the legal standard for the motion, the Court considers the sufficiency of pleading under each of the main theories of discrimination Plaintiffs advance: (1) interference with FMLA rights, (2) disparate treatment under Title VII and the ADEA, and (3) disparate impact under Title VII and the ADEA.

### A.  Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. *Ileto v. Glock*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Under Federal Rule of Civil Procedure 8, which requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), a complaint may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory. *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).

While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 558-59 (2007) (citations and quotations omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

4

1  *Iqbal*, 556 U.S. at 678 (citation omitted).  "[W]here the well-pleaded facts do not permit the court
2  to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not
3  'show[n]' – that the pleader is entitled to relief."  *Id.* at 679.  Where dismissal is warranted, it is
4  generally without prejudice, unless it is clear the complaint cannot be saved by any amendment.
5  *Sparling v. Daou*, 411 F.3d 1006, 1013 (9th Cir. 2005).

### B. Interference with FMLA Rights

Twitter challenges Weinberg's FMLA claim on several grounds.  First, it argues that Weinberg fails to state a claim for interference with her FMLA rights.  Second, it moves to dismiss the allegations related to a putative FMLA class, arguing both that the proposed class definition is too uncertain to survive at the pleading stage and that Weinberg lacks standing to represent a putative class that would include employees who were constructively discharged.  The Court take up these issues in turn.

#### 1. Sufficiency of Pleading

The FMLA creates two interrelated substantive rights: (1) employees have a right to use a certain amount of leave for protected reasons and (2) employees have a right to return to their jobs or equivalent jobs after using protected leave.  *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. 2612(a), 2614(a)).  "Employer actions that 'deter employees' participation in protected activities constitute interference or restraint with the employees' exercise of their rights."  *Perata v. City & Cnty. of San Francisco*, 2023 WL 4537695, at *22 (N.D. Cal. July 13, 2023) (quoting *Bachelder*, 259 F.3d at 1124).  "[T]he inquiry for interference is whether the employer's conduct makes an employee 'less likely to exercise their FMLA leave rights [because] they can expect to be fired or otherwise disciplined for doing so.'"  *Olson v. United States by & through Dep't of Energy*, 980 F.3d 1334, 1338 (9th Cir. 2020) (quoting *Bachelder*, 259 F.3d at 1124).  To state a claim for unlawful interference with an employee's rights under the FMLA, a plaintiff must allege that she (1) "took FMLA-protected leave," (2) "suffered adverse employment actions," and (3) that "the adverse actions were causally related to [plaintiff's] FMLA leave."  *Duane v. IXL Learning, Inc.*, 2017 WL 2021358, at *2 (N.D. Cal. May 12, 2017) (citing *Bachelder*, 259 F.3d at 1125).

1  Weinberg alleges she was terminated within one month of returning from 10 weeks of
2  FMLA leave. Compl. ¶¶ 28-29. Weinberg accordingly satisfies the first two elements of her
3  interference claim: she took FMLA-protected leave and, shortly after returning, she suffered an
4  adverse employment action in being selected for layoff. The parties' dispute focuses on whether
5  Weinberg sufficiently pleads causation. Twitter attacks the sufficiency of pleading a causal
6  connection on two points: (1) that the temporal proximity between Weinberg's return from FMLA
7  leave and the RIF is insufficient to support causality, and (2) that the statistics she presents are
8  inapt to show that employees on or recently returned from FMLA leave were more likely to be
9  laid off than other employees. Mot at 7-8.

10  A close temporal proximity between a return from FMLA-protected leave and termination
11  supports an inference of unlawful interference. *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1137
12  (9th Cir. 2003). "At the pleading stage, the temporal proximity between [plaintiff's] return from
13  FMLA leave and termination is enough to support a plausible inference that [defendant] violated
14  the FMLA." *Duane*, 2017 WL 2021358, at *2.

15  Twitter argues that Weinberg "has not alleged facts sufficient to support an inference that
16  her FMLA leave was a negative factor in her selection for layoff." Mot. at 7. In significant part,
17  Twitter avers that any temporal connection between her return from leave and her layoff is
18  mitigated by the sheer number of layoffs – Weinberg's use of FMLA leave loses meaning in light
19  of the layoff of more than 2,600 employees. *Id.* Yet under the FMLA, an employer is prohibited
20  from "us[ing] an employee's taking of FMLA leave as a 'negative factor' in making 'adverse
21  employment decisions.'" *Banaga v. Gov't Emps. Ins. Co.*, No. 18-CV-02756-GPC-KSC, 2019
22  WL 2451418, at *5 (S.D. Cal. June 12, 2019). The size of Twitter's massive RIF does not insulate
23  it from liability under the FMLA if the company considered Weinberg's decision to take FMLA
24  leave as a negative factor when deciding to select her for layoff. Put another way, Twitter's
25  decision to undertake an RIF did not give it license to discriminate against employees who took
26  FMLA leave when choosing who to retain and who to lay off. Weinberg's "termination could
27  have been motivated by multiple reasons," but if one of those reasons was her recent FMLA leave,
28

then Twitter unlawfully interfered with her rights under the FMLA. *Duane*, 2017 WL 2021358 at *3.

Further, Weinberg's allegations regarding the temporal proximity between her FMLA leave and her layoff must be considered in conjunction with her statistical allegations. *See Xin Liu*, 347 F.3d at 1137 (considering evidence collectively when assessing FMLA claim). In support of her allegations, Weinberg provides data indicating that employees who were on leave on November 4, 2022, were more likely to be laid off than employees who were not on leave. Compl. ¶ 30. Twitter asserts that this data is "insufficient" because it encompasses all employees who were on leave, not just those employees who were on FMLA leave, and it is insufficient because Weinberg was not herself on leave when she was laid off. Mot. at 15. But Twitter demands too much at the pleading stage because the Court need not assess any purported imperfection of the statistical allegations. *See Nat'l Fair Hous. All. v. Fed. Nat'l Mortg. Ass'n*, 294 F. Supp. 3d 940, 948 (N.D. Cal. 2018) (explaining that defendant's "specific contentions about alleged deficiencies in methodology go to the weight of the evidence and are not dispositive of the determination whether Plaintiffs have adequately pled discrimination at this procedural stage."). Here, data illustrating Twitter's treatment of employees who were on leave – a group which encompasses employees who were on FMLA leave – supports an inference of discrimination against employees who were on or had recently taken FMLA leave. *See* Compl. ¶ 30. These statistical contentions, considered in conjunction with Weinberg's other allegations regarding temporal proximity and the subsequent departure of the majority of the remaining employees on leave after Musk's ultimatum, plausibly establish a causal link between FMLA leave and layoffs. Weinberg has pleaded enough to avoid dismissal of this claim.

### 2. Class Claims under FMLA

Twitter additionally moves to dismiss Weinberg's FMLA class claims on two fronts, considered in turn: (a) uncertainty in the proposed FMLA class definition and (b) lack of standing to assert the claim on behalf of employees who were "constructively discharged."

//

//

### a. Certainty of Class Definition

Weinberg asserts a FMLA claim "on behalf of employees, who were laid off by Twitter following Musk's acquisition of the company who had recently taken, or were preparing to take, a family and medical leave, under the FMLA." Compl. ¶ 61. Twitter argues that it remains unclear whether the reference to employees who had taken FMLA leave "recently" means FMLA leaves within one week, two weeks, four weeks, two months, six months, or some other time period. Similarly, Twitter argues that it the scope of "preparing to take leave" lacks certainty and would not be known by Twitter.

"[T]he granting of motions to dismiss class allegations before discovery has commenced is rare" because "the shape and form of a class action evolves only through the process of discovery." *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007); *see also Thorpe v. Abbott Lab'ys, Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D. Cal. 2008) ("Motions to strike class allegations are disfavored because a motion for class certification is a more appropriate vehicle"). The Ninth Circuit has made clear, "Our cases stand for the unremarkable proposition that often the pleadings alone will not resolve the question of class certification and that some discovery will be warranted." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009).

Twitter argues that Weinberg's proposed class definition is "fatally uncertain," such that the proposed class is not ascertainable. Mot. at 8. Twitter cites little authority for the premise that class claims may be dismissed at the pleading stage for lack of factual support to utilize the class mechanism. Mot. at 8 (citing, *e.g.*, *Zamora v. Penske Truck Leasing Co., L.P.*, No. 220CV02503ODWMRWX, 2021 WL 809403, at *3 (C.D. Cal. Mar. 3, 2021)). In *Zamora*, for example, the court considered dismissal of class allegations at the pleading stage based on a lack of factual support that the claim affected a putative class of plaintiffs. *Id.* at *3. But here, Weinberg plausibly alleges that Twitter's RIF interfered with the FMLA-protected rights of a large number of laid-off employees. *See* Compl. ¶ 30. To the extent Twitter challenges the putative class definition as indefinite, questions about ascertainability of the class are "best decided at the class certification stage with the benefit of more complete briefing and development

United States District Court
Northern District of California

1   of the record." *TopDevz, LLC v. LinkedIn Corp.*, 2021 WL 3373914, at *12 (N.D. Cal. Aug. 3,
2   2021). The Court therefore will not dismiss the class allegations at the pleading stage.

### b. Standing

Twitter argues further that Weinberg's class allegations should be dismissed because she lacks standing to assert claims on behalf of employees who were constructively discharged. Like the argument discussed in the preceding section, this argument is better left for the class certification stage.

While putative class representatives must have Article III standing from the outset, the argument that a class representative lacks standing to proceed on behalf of the class "confuse[s] the standing analysis in a class action for the class certification analysis." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 967 (9th Cir. 2019). "[O]nce the named plaintiff demonstrates her individual standing to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a) prerequisites for class certification have been met." *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015)) (quoting 1 William B. Rubenstein, Newberg on Class Actions § 2:6 (5th ed. 2011)). Twitter does not assert that Weinberg lacks standing to bring an FMLA claim. Twitter instead argues Weinberg is not similarly situated enough to other putative members of the proposed class to bring claims on their behalf. This is a challenge to adequacy or typicality under Rule 23, not a challenge to Article III standing of the sort that calls into question the Court's subject-matter jurisdiction. *See Melendres*, 784 F.3d at 1262. This issue is properly resolved at the class certification stage. Accordingly, Twitter's motion to dismiss the FMLA class claims is DENIED.

### C. Disparate Treatment Under Title VII and ADEA

Disparate treatment occurs "where an employer 'treat[s] [a] particular person less favorably than others because of' a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (quoting *Watson v. Forth Worth Bank & Tr.*, 487 U.S. 977, 985-86 (1988)). "To establish a prima facie case, plaintiffs must offer evidence that gives rise to an inference of unlawful discrimination," which they may do with "circumstantial evidence by showing: (1) that they are members of a protected class; (2) that they were qualified for their positions and performing their

9

1   jobs satisfactorily; (3) that they experienced adverse employment actions; and (4) that similarly
2   situated individuals outside their protected class were treated more favorably, or other
3   circumstances surrounding the adverse employment action give rise to an inference of
4   discrimination." *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (citations,
5   internal quotation marks, and brackets omitted).[3]  In support of the final element, a plaintiff must
6   allege that "the defendant had a discriminatory intent or motive" in taking the challenged adverse
7   employment action. *Watson*, 487 U.S. at 986.  Thus, "[i]t is insufficient for a plaintiff alleging
8   discrimination under the disparate treatment theory to show the employer was merely aware of the
9   adverse consequences the policy would have on a protected group." *Wood v. City of San Diego*,
10  678 F.3d 1075, 1081 (9th Cir. 2012) (quoting *Am. Fed'n of State, Cnty., & Mun. Emps. v.
11  Washington*, 770 F.2d 1401, 1405 (9th Cir. 1985)).

12          There is no question that Plaintiffs have pled all facts necessary to establish the first three
13  elements of a prima facie case of disparate treatment under Title VII and the ADEA.  First,
14  Plaintiffs have all pleaded that they are members of at least one protected class: Weinberg,
15  Gongora, Steele, Sills, and Bessinger allege that they are female and were discriminated against by
16  Twitter on the basis of their sex, Ogunsanya alleges that he is Black and was discriminated against
17  by Twitter on the basis of his race, and Bessinger and Ihara allege that they are age fifty (50) or
18  older and were discriminated against by Twitter on the basis of their age.  Compl. ¶¶ 3-5.  Second,
19  Plaintiffs have all identified their positions at Twitter and pleaded that their job performance met
20  Twitter's expectations at the time of the layoffs.  Compl. ¶¶ 9-15.  Third, Plaintiffs have all
21  pleaded that they suffered adverse employment actions when they were laid off by Twitter.
22  Compl. ¶ 25; ¶¶ 31-42 (sex); ¶ 48 (race).  Plaintiffs thus satisfy the first three elements.

23          The fourth element requires more analysis.  Plaintiffs all plead that they were treated less
24  favorably than similarly situated employees who were not members of their respective protected
25  classes.  Compl. ¶¶ 28-59.  Plaintiffs additionally allege that Twitter acted with animus towards

---

[3] Though the parties refer to these elements in some fashion in their briefing as derived from the *McDonnell Douglas* framework, establishing a prima facie case under *McDonnell Douglas* is not required at the pleading stage. *Austin v. Univ. or Oregon*, 925 F.3d 1133, 1137 (9th Cir. 2019) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)).

their respective protected classes, citing as evidence Elon Musk's offensive public statements and actions regarding women, Black people, and older workers. Compl. ¶¶ 44-47, 49-51, 58-59. Twitter argues that Musk's comments are insufficient to demonstrate animus (*see* Mot. at 12), and that some nexus between the remark showing animus and the decision to take adverse action against the employee is required. *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438-39 (9th Cir. 1990) ("stray 'remarks, . . . when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decisionmaker in issue'"); *see also Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (concluding that a superior's comment that "[w]e don't necessarily like grey hair" "was uttered in an ambivalent manner and was not tied directly to [the plaintiff's] termination" and thus was "at best weak circumstantial evidence of discriminatory animus").

   Twitter's attack focuses too heavily on a portion of the assessment and ignores the totality of Plaintiffs' Complaint. Musk's disparaging comments about members of each protected class evince discriminatory intent when considered "together with" the allegations that Twitter conducted the RIF in a discriminatory manner, including statistical evidence of discrimination. *See Warren v. City of Carlsbad*, 58 F.3d 439, 443-44 (9th Cir. 1995). Twitter downplays the *Merrick* court's recognition that "comments suggesting that the employer may have considered impermissible factors are clearly relevant to a disparate treatment claim," even if one remark is "insufficient to establish discrimination." *Merrick*, 892 F.2d at 1438-39. Indeed, the Ninth Circuit has found ostensibly "offhand" comments evincing racial animus may support an inference of discrimination when considered alongside additional adverse conduct. *Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1129 (9th Cir. 2000) (reading discriminatory remarks in context of other adverse actions taken against Asian American professors, including the forcible relocation of the professors' laboratory, to exhibit discriminatory animus).

   Significantly, another court in this District recently found the some of the same comments referenced here to support a plausible link between Plaintiffs' terminations and their protected characteristics based on the combination of their allegations about Musk's public comments and the disproportionate impact of the adverse employment actions at issue:

> Musk's alleged sexist statements, especially the tweet "Being a Mom is just as important as any career," plausibly support an inference that Musk knew the Post-RIF Policies and the ultimatum email's conditions would be less acceptable to female employees who, according to him, should not prioritize their career over family obligations. ([FAC] ¶ 38.) Accordingly, drawing inferences in Plaintiff's favor, these facts plausibly support an inference Musk, the owner and CEO of Twitter, had a discriminatory intent to have more women than men "forced out of the company" when he implemented the Post-RIF Policies and sent out the ultimatum email because he expected women to be less committed to their career and thus less likely to consent to these changes. (*Id.* ¶ 36.)

*Frederick-Osborn v. Twitter, Inc.*, No. 24-CV-00125-JSC, 2024 WL 1354529, at *5 (N.D. Cal. Mar. 29, 2024). Similarly here, the Court finds that Musk's comments evinced a discriminatory intent to force out those members of protected classes. Further, the Court finds that the combination of the statistical evidence of differential treatment in the RIF (*see, e.g.*, Compl. ¶ 42) and Musk's antagonistic comments about women and older workers (*see, e.g.*, Compl. ¶¶ 44-45, 59), combined with the allegations regarding the lack of consideration given by managers in the course of making RIF decisions (Compl. ¶¶ 24-26), collectively support an inference of discriminatory intent against women and older workers in the RIF process. The Court accordingly concludes that the "totality of the evidence permits a rational inference that" Twitter's "actual motive" for terminating Weinberg, Gongora, Steele, Sills, Bessinger, and Ihara was discriminatory. *Davis v. Zurich Am. Ins. Co.*, No. 3:19-CV-04397-WHO, 2021 WL 369538, at *10 (N.D. Cal. Feb. 3, 2021) (viewing evidence as a whole to deny employer's motion for summary judgment). On this holistic view, Weinberg, Gongora, Steele, Sills, Bessinger, and Ihara sufficiently allege disparate treatment, and their claims need not be dismissed.

In contrast, Ogunsanya does not sufficiently describe differential treatment on the basis of race. Ogunsanya only alleges in conclusory fashion that "Black employees were statistically more likely to be chosen for layoff than other employees." Compl. ¶ 48. This contention is not bolstered by additional factual support, such as statistical charts showing a comparison of Black employees laid off compared to others. *Cf., e.g.*, Compl. ¶ 42 (chart showing disparate layoffs of women). In light of this deficiency, the claim for disparate treatment based on race has not been sufficiently pleaded.

#### D. Disparate Impact Under Title VII and ADEA

To state a claim for disparate impact discrimination under Title VII, a plaintiff must allege (1) a significant disparity with respect to employment for the protected group, (2) the existence of a specific employment practice or set of practices, and (3) a causal relationship between the identified practice and the disparity. *Freyd v. University of Oregon*, 990 F.3d 1211, 1224 (9th Cir. 2021). "At the pleading stage, the complaint need only allege facts giving rise to plausible inferences that the disparity exists and is caused by the identified practice." *Liu v. Uber Techs. Inc.*, 551 F. Supp. 3d 988, 990 (N.D. Cal. 2021).

Plaintiffs have generally met their burden here by Plausibly alleging all elements of a prima facie disparate impact claim. First, Weinberg, Gongora, Steele, Sills, and Bessinger allege that Twitter's mass layoff affected women significantly more than men. Compl. ¶¶ 27, 31-43. And Bessinger and Ihara allege that Twitter's mass layoff affected employees ages 50 and older significantly more than younger employees. Compl. ¶¶ 27, 52-56. But in contrast, and similar to the deficient disparate treatment allegations, the allegations of disparity based on race are conclusory and factually unsupported. *See* Compl. ¶¶ 48-51. The disparate impact claim based on race thus fails.

Considering the second element, the remaining Plaintiffs all identify a "specific employment practice" giving rise to their disparate impact claim. In the course of the RIF that occurred following Musk's acquisition of the company, Musk supervised a small group of managers who lacked knowledge of Twitter's operations and who gave little if any consideration to employees' performance, qualifications, experience, and abilities to conduct a rushed decision-making process regarding who to lay off. Compl. ¶¶ 23-27. Plaintiffs present substantial factual allegations in support, including preliminary statistical analyses and evidence of Musk's discriminatory animus, which support an inference of a causal relationship. Compl. ¶¶ 44-47, 49-51, 58-59.

Twitter contends that all Plaintiffs' disparate impact claims are insufficient because they have not identified a "particular employment practice" that resulted in any disparity. However, "a reduction in force can be a specific employment practice that supports a disparate impact claim."

13

*Tsur v. Intel Corp.*, 2022 WL 17985573, at *13 (D. Or. Dec. 29, 2022) (citing *Pottenger v. Potlach Corp.*, 329 F.3d 740, 749 (9th Cir. 2003)). *Pottenger* disposes of this argument: there, the Ninth Circuit recognized that a "disparate impact claim must challenge a specific business practice," before holding unequivocally that a "RIF would constitute such a practice." *Pottenger*, 329 F.3d at 740.

Twitter relies on out-of-circuit authority to assert that the Complaint must identify an actionable employment practice beyond the RIF. *See* Mot. at 14 (citing *Davis v. D.C.*, 925 F.3d 1240, 1250 (D.C. Cir. 2019); *Gilbreath v. Brookshire Grocery Co.*, 400 F. Supp. 3d 580, 591 (E.D. Tex. Aug. 21, 2019)). These cases are at odds with the Ninth Circuit's straightforward conclusion in *Pottenger*. Additionally, the cases that Twitter relies on are unhelpful to the assessment of pleading sufficiency at the motion to dismiss stage because they were decided at the summary judgment stage. Moreover, Plaintiffs' allegations go beyond the mere existence of the RIF.

The Ninth Circuit's opinion in *Freyd v. University or Oregon*, 990 F.3d 1211 (9th Cir. 2021), additionally supports Plaintiffs' argument. In *Freyd*, the Ninth Circuit acknowledged that the plaintiff challenged a specific employment practice by challenging the university's practice of providing retention raises without analyzing relevant factors like merit and seniority to determine whether other comparable faculty also deserved raises. *Id.*

Here, Plaintiffs similarly allege that Twitter declined to consider relevant factors in making layoff selections such as experience and abilities. Compl. ¶¶ 24-26. Plaintiffs' allegations regarding the discriminatory outcomes of the RIF are sufficiently specific at this stage. Plaintiffs allege that "[t]he decisions regarding which employees would be laid off were made under extremely hurried circumstances, with little if any regard given to employees' job performance, qualification, experience, and ability," and that "the layoff decisions were made quickly by a small group of managers, under close supervision of Musk." Compl. ¶¶ 24, 26. The Ninth Circuit has held that "an employer's facially neutral practice of committing employment decisions to the subjective discretion of supervisory employees [is] a specific employment practice properly subject to a disparate impact analysis." *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir.

1   1990); *see also Pottenger*, 329 F.3d at 749 (holding that a "policy of committing employment decisions in a RIF to the subjective discretion of its managers constitute[s] a specific employment practice").

Twitter additionally challenges the statistical data upon which Plaintiffs Weinberg, Gongora, Steele, Sills, and Bessinger rely in support of their sex discrimination disparate impact claim. Specifically, Twitter contends that minor variations in what percentages of female employees, engineers, and non-engineers Plaintiffs allege were fired – variations which in no way contradict Plaintiffs' allegation that the data indicates "women were far more likely than men to be laid off from Twitter" (Compl. ¶ 43) – render the entire disparate impact claim invalid. At the pleading stage, allegations of a disparity need not be as precise as Twitter demands. Plaintiff is "not required at the pleading stage to produce statistical evidence proving a disparate impact [because] . . . all that is required is fair notice of the claims and the grounds upon which they rest, sufficient to raise a right to relief above the speculative level." *Karpe v. Chao*, 416 F. Supp. 3d 1021, 1029 (S.D. Cal. 2019); *see also Twombly*, 550 U.S. at 555. At this stage, what matters is that all the statistics contained in Plaintiffs' complaint support rather than detract from its allegation of disparate impact. Plaintiffs achieve this. Accordingly, the Complaint satisfies this standard and need not be dismissed.

To the extent Twitter separately attacks the ADEA disparate impact claim, that argument also fails. Twitter argues that Plaintiffs Bessinger and Ihara have failed to state a disparate impact claim because the ADEA "does not recognize a disparate impact claim predicated on disparities for a 'subgroup' of older workers who are age 50 or older." Mot. at 18. This same argument was recently rejected in this District. *See Zeman*, 2023 WL 5599609, at *5 (noting that the ADEA's provisions regarding disparate treatment and disparate impact both prohibit discrimination because of any individual's age, and "read[ing] the disparate treatment provision to prohibit discrimination based on a class of individuals aged forty and over rather than based on age would contradict both the plain language of the statute and the Supreme Court's holding in *O'Connor*." (referring to *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996)). Thus, Plaintiff's ADEA disparate impact claim for a potential class of Twitter employees aged 50 and older is cognizable.

15

*Id.*; *see also Fox v. Bonneville Admin.*, 243 F.3d 547 (9th Cir. 2000) (unreported case) (stating that allegations in plaintiffs' class complaint that company's policy had a disparate impact on workers over 50 years old were sufficient to state a disparate impact claim); *O'Brien v. Caterpillar, Inc.*, 900 F.3d 923, 929-30 (7th Cir. 2018) (recognizing potential disparate impact claims for a group of employees age 55 and older); *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 70-81 (3rd Cir. 2017) (holding that age discrimination disparate impact claims are not limited to 40-and-older comparisons, and can be based on subgroups).

In sum, Twitter's several challenges to the sufficiency of Plaintiffs' pleading of disparate impact under Title VII and the ADEA all fail, except for the claim of racial disparate impact. The Court denies the motion as to these claims as well.

## III. CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS in part and DENIES in part** Twitter's motion to dismiss. Plaintiffs' claims under the FMLA are sufficiently pleaded, as are those alleging disparate treatment and disparate impact under the ADEA. Plaintiffs' claims of racial discrimination under Title VII are **DISMISSED** with leave to amend, but the claims of sex discrimination are sufficiently pleaded. Plaintiffs may file an amended complaint within 28 days from the date of this order. No new claims or parties may be added without leave of Court or stipulation of Defendant.

**IT IS SO ORDERED.**

Dated: August 21, 2024

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**